J-S43013-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| BRIAN KEITH ISBELL | |
| Appellant | No. 1619 WDA 2017 |

Appeal from the Judgment of Sentence imposed July 5, 2017
In the Court of Common Pleas of Westmoreland County
Criminal Division at No: CP-65-CR-0003323-2015

BEFORE: STABILE, DUBOW, and NICHOLS, JJ.

MEMORANDUM BY STABILE, J.: **FILED OCTOBER 22, 2018**

Appellant, Brian Keith Isbell, appeals from his judgment of sentence of 10-35 years' imprisonment for involuntary deviate sexual intercourse ("IDSI"), endangering the welfare of children and aggravated indecent assault.[1] We affirm.

A jury found Appellant guilty of the above crimes for sexually assaulting his girlfriend's minor child. Following sentencing, Appellant filed timely post-sentence motions challenging the weight of the evidence and the length of his sentence. In an opinion and order dated September 25, 2017, the trial court thoroughly recounted the factual and procedural history of this case and denied Appellant's post-sentence motions.

_____

[1] 18 Pa.C.S.A. §§ 3123(a)(7), 4304(a), and 3125(7), respectively.

Appellant timely appealed to this Court and filed a timely Pa.R.A.P. 1925(b)

statement of issues complained of on appeal. The trial court issued a

Pa.R.A.P. 1925(a) statement incorporating by reference its September 25,

2017 opinion.

> In this appeal, Appellant raises two issues:
>
> I. Did the trial court abuse its discretion in denying the motion for a new trial on the grounds that the guilty verdicts for IDSI, endangering welfare of children, and aggravated indecent assault were contrary to the weight of the evidence presented in that the Commonwealth's evidence was of such low quality, tenuous, vague and uncertain as to make the verdict of guilty pure conjecture; and, therefore, shocks the conscience of the Court?
>
> II. Did the trial court abuse its discretion in imposing a sentence that was manifestly excessive, unreasonable, and contrary to the dictates of the Sentencing Code when the trial court overlooked and/or failed to carefully consider relevant factors when sentencing [Appellant], including the unique facts and circumstances of the crimes, and his background and rehabilitative needs?

Appellant's Brief at 8.

The law pertaining to weight of the evidence claims is well-settled. The

weight of the evidence is a matter exclusively for the finder of fact, who is free

to believe all, part, or none of the evidence and to determine the credibility of

the witnesses. *Commonwealth v. Forbes*, 867 A.2d 1268, 1273–74 (Pa.

Super. 2005). A new trial is not warranted because of "a mere conflict in the

testimony" and must have a stronger foundation than a reassessment of the

credibility of witnesses. *Commonwealth v. Bruce*, 916 A.2d 657, 665 (Pa.

Super. 2007). Rather, the role of the trial judge is to determine that

- 2 -

notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. *Id.*

On appeal, "our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence." *Commonwealth v. Knox*, 50 A.3d 732, 738 (Pa. Super. 2012). An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice. *Forbes*, 867 A.2d at 1273–74.

After careful review of the record, we conclude that the trial court accurately and thoroughly addressed the merits of Appellant's weight of the evidence challenge. Trial Court Opinion, 9/25/17, at 1-19. Accordingly, Appellant's argument fails.

Next, Appellant challenges the discretionary aspects of his sentence by arguing that the trial court failed to consider the circumstances of his crimes, his background and his rehabilitative needs. In reviewing challenges to the discretionary aspects of a sentence, we have observed:

> Appellant is not entitled as of right to a review of such a challenge. Our jurisdiction over a claim regarding the discretionary aspects of sentence must be established as follows:
>
>> We conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P.

> 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S. § 9781(b).

*Commonwealth v. Levy*, 83 A.3d 457, 467 (Pa. Super. 2013) (quoting *Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010)).

Appellant satisfies the first three elements of this test. He filed a timely notice of appeal and timely post-sentence motions seeking modification of his sentence. His brief discussed the reasons relied for allowance of appeal as to the discretionary aspects of his sentence. We now turn to the fourth element, whether there is a substantial question that the sentence appealed is not appropriate.

"A substantial question exists where an appellant sets forth a plausible argument that the sentence violates a particular provision of the Sentencing Code or is contrary to the fundamental norms underlying the sentencing process." *Commonwealth v. Johnson*, 873 A.2d 704, 708 (Pa. Super. 2005). Appellant argues that the trial court failed to adequately consider the unique facts and circumstances of his crimes and his background and rehabilitative needs. "There is ample precedent to support a determination that [Appellant]'s allegation[s] fail[] to raise a substantial question that his sentence is not appropriate under the Sentencing Code." *Commonwealth v. Griffin*, 65 A.3d 932, 936 (Pa. Super. 2013) (collecting cases). Additionally,

Appellant does not argue that the trial court lacked adequate information to fashion his sentence. Instead, Appellant is displeased with the way the trial court weighed the relevant facts. It is well-settled, however, that mere dissatisfaction with the sentencing court's weighing of sentencing considerations is not sufficient to raise a substantial question for our review. *Moury*, 992 A.2d at 175.

Even if Appellant raised a substantial question, the trial court properly exercised its discretion in determining his sentence. "When imposing a sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant." *Commonwealth v. Griffin*, 804 A.2d 1, 10 (Pa. Super. 2002). "In particular, the court should refer to the defendant's prior criminal record, his age, personal characteristics and his potential for rehabilitation." *Id.* Where the sentencing court had the benefit of a presentence investigation report ("PSI"), we can assume the sentencing court "was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Devers*, 546 A.2d 12, 18 (Pa. 1988). Further, where a sentence is within the standard range of the guidelines, Pennsylvania law views the sentence as appropriate under the Sentencing Code. *Moury*, 992 A.2d at 171 (combination of PSI and standard range sentence, absent more, cannot be considered excessive or unreasonable).

The trial court's opinion makes clear that it considered a wide range of factors, including but not limited to the presentence investigation, and imposed a sentence within the standard guidelines. Trial Court Opinion, 9/25/17, at 21-22. Thus, Appellant fails to establish that the trial court abused its discretion.

We direct that a copy of the trial court's September 25, 2017 opinion be filed along with this memorandum and attached to any future filings in this case.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/22/2018

# IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA )
)
vs. )　　No.　3323 C 2015
)
BRIAN KEITH ISBELL, )
Defendant. )
)

## OPINION AND ORDER OF COURT

This matter comes before the court for consideration of Defendant's post-sentence motions that have been filed in the above-captioned case.

## FACTUAL AND PROCEDURAL HISTORY:

The charges in this matter arise from incidents that occurred between 1998 and 2000 in New Kensington, Westmoreland County, Pennsylvania, wherein Defendant sexually abused his stepdaughter, S.I.

Leann Isbell, Victim's ("S.I.'"'s) mother, testified that she and her husband, Brian Isbell ("Defendant"), moved to New Kensington, Westmoreland County, in 1998. The pair moved into a single family home with Isbell's children, S.I., B.I., and A.I. (TT 51).[1] B.I. and A.I. were Isbell and Defendant's biological children, while S.I. had a different father. She stated that when the couple moved to New Kensington, B.I. was 2 years old, A.I. was 1 year old, and S.I. was 6 years old.

---

[1] Numerals in parenthesis preceded by the letters "TT" refer to specific pages of the transcript of the testimony presented at trial, held April 3-4, 2017, and made a part of the record herein.

1

At the time, Isbell worked as a registered nurse. Her shifts would rotate, and she was forced to work both daylight and night shifts at certain times. (TT 54). She stated that she would typically work alternating weeks of night shifts and day shifts. (TT 54). She testified that when she worked night shifts, she would leave for work at approximately 10:30 p.m. and return home at approximately 8 a.m. (TT 55).

In the home, B.I. and A.I. shared a bedroom, and S.I. had a smaller bedroom where she would keep most of her belongings. (TT 55-56). She stated that S.I. still preferred to sleep in the bedroom with her siblings, as her bedroom did not have heat. (TT 56). Isbell stated that while she was working, Defendant would care for the children. (TT 56). At that time, he was not working a full-time job. (TT 56). Isbell and Defendant divorced in 2000 and Defendant moved out of the residence. (TT 57). She stated that after the pair divorced, S.I. would occasionally see Defendant, as he would still sometimes care for the children when she was working. (TT 57). Isbell also testified that S.I. had the same surname as Defendant because S.I. was only 3 years old when Isbell and Defendant married. She stated that S.I. called Defendant "dad" and thought of him as her biological father. (TT 58). It was only after Defendant and Isbell divorced that S.I. learned that Defendant was not her biological father. (TT 62). When S.I. asked for more information about her biological father, Isbell told her that she did not know many details, and that he had passed away. (TT 62).

Isbell stated that S.I. visited with Defendant sporadically after their divorce, when she accompanied Defendant's biological children for visits. (TT 60). She testified that at the time she was married and living with Defendant, she did not have reason to believe

2

that anything improper was happening between Defendant and any of the children. (TT 61).

Isbell also testified that her relationship with S.I. had its "ups and downs" and that it "was a very trying relationship." (TT 63). She stated that she told Defendant about their issues, and Defendant offered to have S.I. stay with him at his residence in Pittsburgh. (TT 63). Isbell stated that at the time, S.I. was approximately 13 years old. (TT 65). She continued: "When I suggested that to her she really stated she didn't want to do that but it was to the point in our relationship where I told her we need to do this." Further:

> She went ahead and packed her things and the arrangement was going to be that she would stay there for a week. She went there, I'm not sure how many days it may have been, two or three, it wasn't for the full week and she called me very upset and said she wanted me to come and pick her up. I said, well, why? What happened? What's going on? She just said, can you just come pick me up?
> (TT 64-65).

She said that when she arrived to retrieve S.I. from Defendant's home, S.I. was visibly upset, and Defendant was angry. (TT 66). She asked both of them what had happened, but neither one of them wanted to talk about it. (TT 66). Defendant only stated that "you need to take her and you need to go." (TT 66).

Isbell stated that she first learned of Defendant's abusive relationship with S.I. in 2014. (TT 66). She testified as to the circumstances of the discovery as follows:

> We had recently moved to a new house in New Castle. I was dating and engaged to a man. I have a younger daughter who was about 6 years old at the time and I had not been working nights for quite a while, but I was in a new position where I was going to be working day and night again. [S.I.] . . . came to me and said she needed to talk to me about something, it

3

was important. I said okay, what is it? She said, well, I need to talk to you privately. I said, okay. We went somewhere private where we could talk about it. She broke down in tears and she said I can't even tell you, like, I don't even know what to say. I said, well, just tell me. I was very concerned at that point what I was going to hear. Just tell, me, what is it? She said, I don't want to tell you because things are going to change. You're going to look at me differently. I said, no, I just want to know what's going on. I want to help you. Just tell me what's going on. She told me.
(TT 66-67)

Isbell became very upset, and informed S.I. that they needed to report Defendant's abuse to the police. (TT 67). Although S.I. was initially reluctant, she eventually agreed. (TT 67). At the time she reported the conduct, S.I. was attending the University of Pittsburgh earning her Master's Degree. (TT 68). Isbell testified that S.I. was concerned for her younger sister, and told Isbell that she didn't want Isbell's fiancé to be alone with her sister. (TT 70). She informed Isbell that she did not "trust any man to be there while [Isbell] work[ed] nightshift." (TT 70).

S.I. testified that when she was approximately 7 years old and living in New Kensington with her mother, Defendant, and her siblings, her mother began working night shifts. (TT 90). She stated that after Isbell left for work, Defendant would sometimes carry S.I. downstairs to the living room or to his bedroom. (TT 91). At that time:

He typically began with, oh, we should play a game, and the game was truth or dare. During the game – during the game he would dare me to do sexual acts. It would be he would take his clothes off and he would take my clothes off and he would do things. Um, he would put his hands on my body parts, on my breasts, on my behind. He would stick his

4

tongue in my vagina and he would put his penis in my mouth.
(TT 91).

She stated that she did not want to do these things, and felt uncomfortable. (TT 91). She testified that during truth or dare, she would pick truth to avoid engaging in sexual activities. (TT 91). Defendant would become angry and tell her that she could not always pick truth because the game would not be as fun. (TT 91). She stated Defendant removed her from the bedroom on more than one occassion, and always when her mother was working the night shift. (TT 91). Although she could not pinpoint the number of times he sexually abused her, she said that it was "pretty often." (TT 92).

During the abuse, Defendant told S.I. that this was their secret and not to tell anyone. (TT 92). He stated that their relationship was special, and just between the two of them. (TT 92). He told her that he was helping her to become more mature, and that S.I.'s vagina was pretty because it did not have hair on it. (TT 92). He also told her to pretend that his penis was a lollipop or popsicle. (TT 92).

S.I. averred that she did not tell her mother about the sexual abuse because she did not realize that what Defendant was doing was wrong. (TT 93). She stated: "I wasn't really sure [] it was wrong at the time. I didn't really understand it, you know? [] [H]e treated me good in other ways and gave me attention and I didn't . . . I was uncomfortable but I didn't know specifically that I shouldn't tell someone else." (TT 93).

S.I. stated that after Defendant and her mother divorced, Defendant would come to their residence "not very often." (TT 94). She stated that while there were arrangements

for the children to visit him at his home every other weekend, "we never really went that often." (TT 94).

S.I. also testified regarding an incident during which Defendant attempted to initiate sexual contact when she was a teenager. S.I. testified that "me and my mom got into a pretty intense argument and I threw an object in the living room and made her uncomfortable and she called the police. My option was to go to juvy or go to his house." (TT 95). She also stated:

> I ended up going to his house and I was laying in the bed and he came into the bed and was laying beside me just talking. At the time I did not know what happened to my biological father. I didn't know how he died. My mother told me it was an accident but she never said specifically what happened. He said, well, I know what happened to your real dad and I can tell you, but you have to pull your pants down first so I know you won't go back and tell your mom I told you.
> (TT 95).

At that point, S.I. became upset and began to cry. Defendant then asked her what was wrong and why she was upset, to which she responded that she wanted to go home. (TT 96). She testified that when her mother picked her up, she did not tell her what had transpired. (TT 96). She said that she was still upset and did not know how to tell her. She stated that "he was still my brother and sister's father. I didn't want to do anything wrong." (TT 96).

Into her teenage years, S.I. stated that she had infrequent contact with Defendant, mainly through text messages and Facebook. (TT 98). She stated that he would mainly text her on holidays. (TT 98). While S.I. was in college, Defendant messaged her on Facebook. S.I. did not typically respond. (TT 99). She stated that in 2012, she told

6

Defendant to stop messaging her. He continued to contact her. (TT 99). She stated that when she would not respond to his messages on Facebook, he would send her text messages. (TT 100). She testified that she started thinking about Defendant's abuse more when she began student teaching. (TT 100). She testified:

> He told me on Facebook that he doesn't understand why I'm doing this, that I'm bitter and angry. [] [H]e ended up talking about how much he did for me growing up, how he was there and no one else really cared about me, didn't do much for me. He was the only one who was always there for me.
> (TT 100).

S.I. also confirmed that she reported Defendant's abuse to her mother based on the fact that her younger sister was 6 years old, her mother was working night shifts again, and her mother's fiancé began babysitting her younger sister while her mother was at work. (TT 102). She stated that she did not want what had happened to her to happen to her younger sister. (TT 102). She also testified that she was hesitant to report Defendant's actions to the police, because "I didn't want to go through and be put through it again and have to remind myself of it." (TT 102). She stated that she reported his actions because she did not want him to hurt any other children. (TT 103).

The Commonwealth entered into evidence a voluminous record of text and Facebook messages between S.I. and Defendant, beginning in June 2012 and ending in December 2013. (TT 115-150). A portion of those messages are contained herein. When S.I. initially accused Defendant of sexual abuse, the following exchange occurred:

> **Defendant:** Damn, [S.I.], they say that love holds the greatest potential for healing the past and creating a better future. I reached out to you out of love. Wherever you feel wronged or

7

hurt, [S.I.], please choose to forgive. Don't do it for me or for others, but please do so [f]or yourself. For yourself.

**S.I.:** Do you know what I'm talking about?

**Defendant:** Just looked at my calendar. I'll be at Starbucks tomorrow meeting CEO of Coro Fellowships, Sala Udin. That's at 11a. May I treat you to lunch after? It's the Starbucks at the corner of Craig and Forbes. We can go whenever. He also teaches at Pitt, so plan to try getting an in to a position at Pitt.
(TT 117).

A few months later, in July 2012, after receiving several unanswered messages from Defendant, S.I. messaged Defendant and wrote that "you haven't done anything for me in life but hurt me." (TT 120). Defendant responded:

> **Defendant:** [S.I.], I don't know how you can say that. I love you with all of my heart. I made mistakes as a father and I have grown from that. I'm sorry you choose to live in the past and walk around with such hate in your heart for me while I continue to love you unconditionally and stand by you, even as you purposely hurt me and turn away from my love. You seem to have this very elementary view about life and human error []. We all error [sic], but you know what? Our mistakes don't define us, our ability to recover, to learn from them does. Oh my gosh, [], how can you say such a thing?
> **S.I.:** You molested me when I was a child because it's the truth.
> **Defendant:** S.I., I did no such thing. This is so damn hurtful.
> (TT 120-21).

After several more messages back and forth, Defendant stated:

> **Defendant:** So you take this position instead of believing either I didn't do it or honestly don't remember? What the hell are you trying to prove? That you can be heartless and emotionally aloof? We already covered that. How about being resolute in your desire to overcome this? Talk to me.
> **S.I.:** You're a liar period. You molested me when I was young and tried to do it again when I was 13. Now lie and

8

plea [sic] innocent? Goodbye. You could never forget something like that and I damn sure didn't make it up. You did it plenty of times.

**Defendant:** How smart is that? You just said you blocked it out of your mind for 13 years then unblocked it but, yes, don't think anyone else could do the same or could have been dreaming or sleepwalking or anything. I don't need to lie. Any mistake I ever made I owned up to. Does it make you feel better to call me names? To selectively remember supposed bad things and none of the good? That makes you feel better, less angry?

**S.I.:** Hell fucking no. You molested me. You're sick. I would never dream that shit.

**Defendant:** Forgiveness comes from within []. You don't forgive for the other person, you forgive for yourself so that your own personal growth isn't stunted so that you can have richer relationships.

**S.I.:** I remember you molested me. Now I have to work. Goodbye.
(TT 122-24).

Later in the exchange, Defendant wrote:

**Defendant:** I never said I forgot. I honestly don't remember. There's a difference. And I said I don't think I would do such a thing. But in either case, I presented a general position that I could have been a better man, father, and person to you . . . And I'm truly sorry for all the pain I have caused. It is a source of profound regret. And in a roundabout way I beg for your forgiveness. Not because I'm worthy of your forgiveness, but because you are unworthy of the pain, anger, the shackles placed upon your heart and mind because of it. More importantly, I never blamed anyone else for my failings. I have taken full responsibility.
(TT 124-25).

9

Approximately one month later, in August 2012, after Defendant messaged her on Facebook, S.I. texted Defendant and told him not to contact her. (TT 130). Defendant responded:

> **Defendant**: Wow, [] I don't know what to say. I missed you and just wanted to know about your trip. It kills me to know that things are like this between us. I will respect your wishes. I just hope you realize one day I love you and I will always be here for you. This hurts me more than anything.
> (TT 130).

A few days later, Defendant sent S.I. messages about forgiveness. S.I. responded:

> **S.I.**: You molested me when I was younger. Stop contacting me.
> **Defendant**: You are so wrong for saying that . . .   I keep trying to establish contact with you and let you know I love you, yet all I get is hate spewed venom. But fuck it I'll respect your wishes.
> **S.I.**: It's the truth.
> (TT 131).

A few weeks later, Defendant sent S.I. a picture of his college degree by text message. (TT 134). S.I. responded:

> **S.I.**: Your degree has nothing to do with me. You molested me continuously when I was younger and my mom worked night shifts. I tried and tried to forget about it but I never could. I never told her because I knew she would blame herself. You tried a couple of other times when I was in middle school when we occasionally came over. You're sick and need help. I always wondered if you tried to do that to [A.I.] or the other girls, and if you did I would never forgive myself for not speaking up, but I figured you only did that to me because I wasn't your child. You will never be around me or my kids, and if I ever find out you touched any of my other sisters – I'm just going to leave it at that.
> (TT 134-35).

Later in the same message thread, Defendant wrote:

10

> **Defendant:** S.I., I have no other choice to believe what you say. I'm not the same person I was five years ago, let alone 10 to 15 years ago. I used to put my hands on women and threaten their lives. I used to have braids and speak improper English. I used to lie, cheat, and steal. I'm not that man anymore.
>
> Another pivotal thing in my childhood that I had to deal with was the fact of my mother's drug addiction. I used to watch her and her friends cut straws into pointy spears and sniff coke, and that probably led to her falling for a man that was wanted by America's Most Wanted. We were held at gunpoint that ended with the police breaking down our doors and pointing shotguns at us to take him out. Just examples from my childhood. Things I had to overcome. Things I had to deal with about my childhood when I got help. And this is just the tip of the iceberg.
>
> And the point is that these things f'ed me up. I didn't have solid footing. I had no clue what marriage was about when I married your mother. I didn't know how to be a man, a husband, a father. I was learning on the job so to speak and with all of my issues. My issues are now largely solved and I'm my own man instead of the Brian that my childhood shaped.
> (TT 134-141).

A few days later, in September 2012, Defendant wrote the following to S.I. through text message:

> **Defendant:** Hey, [S.I], need a quick answer to two questions. I'm weighing two possible job offers, one from CMU and one from UPMC. Say I got the UPMC one, how does that [a]ffect your tuition and work study, or do I have to work for the actual university to give you tuition relief?
> (TT 142)

Various unanswered text messages sent by Defendant in later months asked S.I., among other things, whether she wanted "anything special for your 21st coming up, a huge party, some jewelry, cash?" and stated "Had a horrible nightmare about you getting

11

a DUI. Messed me up. Please let me know you are okay. I love you very much." (TT 144, 146).

S.I. testified that following these communications with Defendant, the pair never reconciled, nor did she attempt to reestablish any kind of relationship with him. (TT 151).

Detective Robert Weaver testified that in September 2014, he was contacted by Leann Isbell, who advised that her daughter, S.I., had disclosed to her that Defendant molested her. (TT 174). He stated that when he interviewed S.I., she reported the same conduct as she had testified to at trial. (TT 174). Detective Weaver also stated that S.I.'s testimony during the preliminary hearing of the case was consistent with her testimony at trial. (TT 177).

Detective Weaver also interviewed Defendant on November 14, 2014. Detectives Weaver and Gardner met with Defendant at the Pittsburgh City County Building and advised him that he was not under arrest, and that he did not have to speak with them. (TT 175). Defendant asked the detectives to describe the allegations that S.I. had made against him. (TT 175). Defendant informed the detectives that S.I. had made the statements against him by text message. (TT 176). Detective Weaver then asked him why he stated in the text messages that he did not remember sexually abusing her, to which Defendant replied that he only wanted to calm S.I. down. (TT 176). Defendant also stated that he believed S.I. was making the allegations because he had other daughters "and she was mad about that." (TT 177).

Defendant testified that he, Leann Isbell, S.I., and his two biological children B.I. and A.I., resided in New Kensington for approximately 3 years. He stated that he would

12

babysit the children during Isbell's night shifts on most workdays. (TT 190). He stated that the situation worked because he was willing to prepare the children's meals and care for them. (TT 190). Defendant also stated that during the 3 years they lived in New Kensington, he was only sporadically employed. (TT 190). He testified that while he was watching the children, he never moved any of them out of their beds during the night. (TT 192).

Defendant stated that after he and Isbell divorced, contact with the 3 children was "frequent[] initially, and then over time, depending on what was going on, that communication decreased." (TT 193). He stated that when his relationship with Isbell suffered, so too did his relationship suffer with the children. (TT 193). He testified that his romantic relationship with Isbell continued off-and-on for approximately 2 years after their divorce, during which time he would sometimes spend the night at the New Kensington residence to care for the children. (TT 194).

Defendant also testified that when S.I. learned that Defendant was not her biological father, she became very upset and told Defendant that he had betrayed her trust. (TT 196). Defendant stated that after S.I. learned he was not her father, their relationship became rocky. (TT 196). He averred that when S.I. entered college, he and Isbell eventually stopped discussing a possible reconciliation. At that point, his relationship with S.I. "really seemed to take a turn for the worst and never really turned around." (TT 197).

While Defendant conceded that S.I. visited him at his home in Shadyside for a time after she and her mother fought, he stated that she was not 13, but was entering her

13

senior year in high school. (TT 198). He testified that "I wouldn't say that she was staying with me," but that Isbell had dropped S.I. off "to try it out for a few days, possibly a week." When asked why S.I. left his residence, he testified:

> It was just that time. I had called Leann to appeal to her to allow [S.I.] to return because [S.I.] wanted to return back to school. She missed her friends, she missed her boyfriend, she missed the comforts of having her own room, and in my apartment in Shadyside she didn't have that benefit. She didn't have her own bed. She didn't have her own room that she could decorate and all these things. Her friends couldn't easily come see her. All the different things she was accustomed to having at her mother's house she did not get to enjoy those things with me, not to mention I was probably more strict.
> (TT 199-200).

Defendant stated that he did not request anything sexual from S.I. when she visited him, nor did he ever. (TT 200). He stated that he did not molest S.I. (TT 200). Defendant testified that in 2012, he began receiving accusatory text messages from S.I. (TT 200). Defendant stated that he was shocked and angry. (TT 200). He stated that he did not know "where they were coming from." (TT 201).

Defendant testified that a few years prior, Isbell began dating a man "who had misrepresented himself as someone he was not," and was actually a drug dealer. (TT 201). Defendant believed that this man's actions may have caused S.I. to make accusations against him. He testified that during Isbell's relationship with this man, Isbell became pregnant, and the man tried to "violently force her to have an abortion." (TT 202). Also, at one point, the man informed Isbell that "after he was done with her in a sexual sense that he was going to come after [S.I.]." (TT 202).

14

Regarding the text and Facebook messages between Defendant and S.I., Defendant addressed the tone of his messages and his reaction to S.I.'s statements as follows:

> It's just not something I would ever do. [S.I.] and I didn't have that sort of relationship. I never had that relationship with any type of child. I really had to keep in mind that I wasn't talking to some woman at a club, I was talking to my daughter, so I had to find a fine line between addressing the allegations and defending myself.
> (TT 203)

He testified that when he told S.I. that he did not recall molesting her, he was "responding in such a way to get her to open up and talk to me." (TT 203). He also stated that when he wrote: "I am left with no other choice but to believe you," his tactic was as follows:

> It is true that if I were ever to have committed an act like this, such a nasty thing, it is true that I could never forgive myself, but at the same time I was not saying that it was something that happened. I was trying to gain her favor, open her up and help her realize that is not something I would do, and in the event that I could ever do anything like that even letting her down is not something I would forgive myself [for].
> (TT 207).

Defendant averred that there were missing text and Facebook messages, and that the pair also communicated in person. For instance, Defendant stated that the pair discussed Defendant paying for S.I.'s car repairs. (TT 209).

Defendant also testified that he was very conservative with the children while they were growing up, and that he would not wipe S.I. when she used the bathroom as a child. (TT 210). Although Defendant testified that he considered himself to be a good father, he

15

said that S.I. was perhaps making allegations of sexual abuse against him because of his shortcomings as a father during S.I.'s childhood. (TT 211).

Defendant was charged with numerous counts stemming with his sexual contact with S.I. A jury trial commenced and Defendant and was found guilty on April 5, 2017 at all counts: 2 counts of Involuntary Deviate Sexual Intercourse, 18 Pa.C.S.A. §3123(a)(7), 1 count of Endangering the Welfare of Children, 18 Pa.C.S.A. §4304(a), and 2 counts of Aggravated Indecent Assault, 18 Pa.C.S.A. §3125(7). On July 5, 2017, Defendant was sentenced to an aggregate period of 10-35 years incarceration. Defendant was found not to be a sexually violent predator.

In his timely post-sentence motions, Defendant avers that the guilty verdict was against the weight of the evidence because S.I.'s testimony was inconsistent and vague. Moreover, Defendant avers that S.I. could not sufficiently state what occurred, the duration, or the date and times of the incidents. He also states that S.I. did not tell anyone at the time that the assaults occurred, and showed no signs that they were occurring, such as changes in behavior or school performance. Moreover, he avers that S.I. did not show any reluctance in spending time with him, and would cry when her mother would not let her visit him. Defendant also asserts that there is evidence that S.I. may have confused Defendant was another man, and that S.I. had motive to fabricate allegations against Defendant.

Defendant also seeks a modification of sentence, and avers that the sentence represents an abuse of discretion. Specifically, Defendant states that the Court failed to consider (1) the specific need for protection of the public in relation to Defendant's

16

actions, (2) the gravity of the offense as it relates to the impact on the life of the victims, and (3) Defendant's need for rehabilitation. Defendant also states that the Court engaged in "double counting" by focusing on the seriousness of the offense, to the exclusion of all other factors. Defendant wishes for the Court to impose a sentence of 3-10 years incarceration, plus 7 years special probation, so that he may successfully reintegrate back into the community.

## ANALYSIS:

### I. WHETHER DEFENDANT'S CONVICTION WAS AGAINST THE WEIGHT OF THE EVIDENCE?

Defendant, though not using exact language, first appears to make a weight of the evidence claim, asserting that the "Commonwealth's evidence was of such low quality, tenuous, vague, and uncertain as to make the verdict of guilty pure conjecture; and, therefore, shocks the conscience of the Court." Defendant also attacks the credibility of S.I., stating that her testimony was inconsistent and tenuous, and that she had motive to fabricate allegations against Defendant.[2]

When a defendant raises a weight of the evidence claim, it is a trial court's role to determine whether "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *In re J.B.*, 106 A.3d 76, 95 (Pa. 2014). A trial court should award a new trial if

---

[2] Defendant included the following alleged motives in his post-sentence motions: "to get attention from her mother, to assist her mother in getting back at him for leaving them and/or in extorting money from Mr. Isbell; to get revenge against him because he wouldn't adopt her, and kept her from having a relationship with her biological father; and/or out of anger that Mr. Isbell did not stay with her mother, and fought with her mother about how she should be more strict about who she dated."

the verdict of the fact-finder "is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Id.* Moreover, "[a] weight of the evidence claim concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the ground that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice." *Comm. v. Lyons*, 79 A.3d 1053, 1067 (Pa. 2013).

In regards to Defendant's attack on S.I.'s credibility, the Court notes that "the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence." *Comm. v. Diggs*, 949 A.2d 873, 878 (Pa. 2008); *see also Comm. v. Cousar*, 928 A.2d 1025, 1032-33 (Pa. 2007). The Court is mindful that "[q]uestions concerning inconsistent testimony . . . go to the credibility of witnesses." *Comm. v. DeJesus*, 860 A.2d 102, 107 (Pa. 2004)

In this case, the jury found S.I.'s testimony credible, and did not find Defendant's testimony credible. Defense counsel thoroughly cross-examined S.I. For instance, defense counsel inquired why S.I. did not report Defendant's sexual abuse once she became a teenager, and why she agreed to stay at Defendant's home in Shadyside. (TT 162-64). Counsel also asked S.I. whether her mother asked her to make up allegations against Defendant. (TT 168). Defendant also testified as to what motive he believed that S.I. had for making such allegations against him; specifically, he stated that he believed that S.I.'s anger over his shortcomings as a father when S.I. was growing up led to her accusations. (TT 211).

18

factors set out in 42 [Pa.Cons.Stat.Ann.] §9721(b), that is, the protection of the public, gravity of offense in relation to impact on victim and community, and rehabilitative needs of the defendant." *Comm. v. Fullin*, 892 A.2d 843, 847 (Pa.Super. 2006). Furthermore, "[a] trial court judge has wide discretion in sentencing and can, on the appropriate record and for the appropriate reasons, consider any legal factor in imposing a sentence . . ." *Comm. v. Stewart*, 867 A.2d 589, 593 (Pa.Super. 2005)(citation omitted).

While trial courts must consider the sentencing guidelines, they retain "broad discretion in sentencing matters." *Comm. v. Mouzon*, 812 A.2d 617, 620-21 (Pa. 2002). Such broad discretion is rooted in the fact that "the trial court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." *Id.* at 620 (quoting *Comm. v. Ward*, 568 A.2d 1242, 1243 (Pa. 1990)). Furthermore, the imposition of consecutive rather than concurrent sentences also lies within the discretion of the court. *Comm. v. Johnson*, 961 A.2d 877, 880 (Pa.Super. 2008) (see also *Comm. v. Hoag*, 665 A.2d 1212, 1214 (Pa.Super. 1995) ("We see no reason why [a defendant] should be afforded a 'volume discount' for his crimes by having all sentences run concurrently.")).

A defendant's argument that a court failed to consider certain factors in fashioning a sentence represents a challenge to the discretionary aspects of the sentence, and "does not raise a substantial question that the sentence was inappropriate." *Hoag*, 665 A.2d at 458. The Court in *Hoag* elaborated that "such a challenge goes to the weight accorded the evidence and will not be considered absent extraordinary circumstances." *Id.* (citing *Comm. v. Urrutia*, 653 A.2d 706 (Pa. Super. 1995)).

factors does not present a substantial question. For these reasons, Defendant's argument

for modification of sentence also fails.